# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| ERIK DUDREY, | |
| Plaintiff, | No. 20-CV-0079-KEM |
| vs. | **MEMORANDUM OPINION AND ORDER** |
| KILOLO KIJAKAZI,[1] Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Erik Dudrey seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying his applications for supplemental security income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383(f), and for disability insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. Dudrey argues that the administrative law judge (ALJ) erred in evaluating his subjective complaints of his symptoms, in giving little weight to the medical opinion of a treating source, and in posing hypothetical questions to a vocational expert (VE). I reverse the Commissioner's decision and remand for further proceedings.

## I. BACKGROUND[2]

Dudrey, born in 1974, has suffered from fibromyalgia, depression, and anxiety

---

[1] Kilolo Kijakazi is substituted for her predecessor in accordance with Federal Rule of Civil Procedure 25(d).

[2] For a more thorough overview of the treatment records, see the Joint Statement of Facts (Doc. 16).

since at least 2000. AR 96, 126.[3] Despite these impairments, he worked several full-time jobs throughout the 2000s. He worked as a data entry clerk from January 2004 to April 2007. AR 21, 397, 435. He testified that he was fired from this position for missing too much work due to health problems. AR 91. He then worked off and on as an office clerk for a few months through a temp agency, before obtaining full-time employment in November 2007. AR 21, 397, 435. From November 2007 until early 2011, he worked as a customer service representative for a cell phone company. *Id.* He testified he was missing work due to pain, ran out of vacation days, and went on short-term disability, and when that expired in June 2011, he was told to resign or complete the paperwork for long-term disability, which he did not do in time. AR 83-84, 565.

On June 28, 2011, Dudrey filed prior applications for disability benefits, alleging disability based on fibromyalgia, depression, and anxiety. AR 124. An administrative law judge (ALJ) issued a written opinion denying these applications on April 22, 2013. AR 119-129. The ALJ noted Dudrey did not begin receiving mental-health treatment until March 2012, and his symptoms improved once he began taking psychiatric medications. AR 125-27.

Dudrey moved to Ohio with his wife in spring 2013 (Dudrey reported moving for his wife's job, but by 2017, his wife was on disability). AR 82, 99, 127. While living in Ohio, Dudrey did not seek treatment for his conditions for about two years. *See* AR 14, 511; Doc. 16. He established care with Ohio providers in March 2015, and from March 2015 to November 2016, he attended regular appointments in Ohio for pain management, psychiatric medication management, and therapy. *See* Doc. 16. He separated from his wife and stayed with family in Iowa from December 2016 through early April 2017. AR 81; *see also* AR 462, 1383. He moved back to Ohio briefly in April 2017, noting at a psychiatric medication management appointment that he had been

---

[3] "AR" refers to the administrative record, filed at Docs. 14-2 to 14-12.

without mental-health medications for a few months, and returned to Iowa to live with his mother for good in May 2017. AR 81, 468, 977, 1382-84.

Shortly after moving back to Iowa, Dudrey required inpatient psychiatric hospitalization for a few days in June 2017, but quickly stabilized once he resumed taking psychiatric medications. *See* AR 1051, 1089-90. He began mental-health treatment at the Abbe Center, seeing a therapist and psychiatrist regularly (records show treatment from summer 2017 through February 2019). *See* Doc. 16. In November 2017, he reestablished care with rheumatologist Michael Brooks, MD, who he had previously seen more than ten years ago for treatment for his fibromyalgia and osteoarthritis. AR 1062-67. He had follow-up appointments with Dr. Brooks in February, June, and October 2018 and February 2019. AR 1057-61, 1297-1301, 1323-27.

Dudrey filed the current applications for DI and SSI benefits on May 14, 2015, alleging disability since April 23, 2013 (the day after the prior ALJ decision) based on chronic pain and fatigue, joint and muscle pain, hypertension, acid reflux, tinnitus, depression, anxiety, memory and concentration problems, and difficulty sleeping. AR 135-36. The Social Security Administration denied the applications on initial review in October 2015 and on reconsideration in November 2015. AR 135-90. An ALJ in Ohio held a hearing on May 4, 2017, and issued an unfavorable decision on May 25, 2017. Doc. 16. As the decision spent less than half a page discussing the treatment records, the Appeals Council granted review in September 2018 and remanded for further consideration. AR 196-204, 212-14. A new Iowa-based ALJ held a second hearing on April 9, 2019, at which Dudrey, his mother, and a VE testified. Doc. 16.

On July 18, 2019, the ALJ issued a written decision following the familiar five-step process outlined in the regulations[4] to determine whether Dudrey was entitled to

---

[4] "The five-part test is whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." **King v. Astrue**, 564 F.3d 978, 979 n.2 (8th Cir. 2009); *see also* **20 C.F.R.**

3

disability benefits. AR 10-22. The ALJ found Dudrey suffered from the following severe impairments: obesity, fibromyalgia, hypertension, affective disorder, anxiety disorder, and degenerative disk disease. AR 12. To aid in the evaluation whether Dudrey could work, the ALJ determined he had the following RFC[5]:

> [Dudrey] has the [RFC] to perform sedentary work . . . in that [he] can occasionally [lift and/or carry 10 pounds and frequently lift and carry less than][6] 10 pounds; can stand/walk for 2 hours; can sit for 6 hours; push pull and operate hand foot controls within these limits; can occasionally climb ramps and stairs; no ladders, ropes and scaffolds; can occasionally balance, stoop, kneel, crouch, and crawl; can understand and remember and carry out simple instructions; use [judgment] in making simple work related decisions and deal with changes in [a routine][7] work setting. He can have occasional contact with the public, coworkers, and supervisors.

AR 14. Relying on a VE's testimony, the ALJ found that Dudrey could not perform his past relevant work, but that a significant number of other jobs existed in the national economy that Dudrey could perform, such as document preparer, addresser, and ticket

---

§§ 404.1520(a)(4), 416.920. The burden of persuasion always lies with the claimant to prove disability, but during the fifth step, the burden of production shifts to the Commissioner to demonstrate "that the claimant retains the RFC to do other kinds of work[] and . . . that other work exists." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004)).

[5] RFC means "the most that a claimant can do despite her limitations." *Sloan v. Saul*, 933 F.3d 946, 949 (8th Cir. 2019) (citing **20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1)**).

[6] The RFC determination contains an obvious typo, but from the ALJ's question to the VE, this appears to be what was meant. *See* AR 14, 71-72.

[7] The opinion states that Dudrey could "deal with changes in the work setting," but the ALJ's hypothetical to the VE asked about a hypothetical individual who could "deal with changes in a routine work setting." AR 72. Dudrey also notes that the way the ALJ wrote the RFC determination, grouping together the ability to use judgment in making simple work-related decisions and the ability to deal with changes, without separation by a semicolon, suggests that the ALJ meant to limit Dudrey's ability to deal with changes to a simple work setting. *See* Doc. 17 at 6. As the ability to deal with changes in the work setting is not a limitation and would not need to be included in the RFC without the "routine" modifier, and given the other typos in the ALJ's written RFC determination, I conclude the ALJ limited Dudrey to the ability to deal with changes in a routine work setting.

4

counter. AR 21-22. Accordingly, the ALJ concluded that Dudrey was not disabled. AR 22.

Dudrey appealed. The Appeals Council denied Dudrey's request for review on June 9, 2020 (AR 1-3), making the ALJ's decision the final decision of the Commissioner.[8] Dudrey filed a timely complaint in this court for judicial review of the Commissioner's decision (Docs. 1, 4).[9] The parties briefed the issues (Docs. 16-19) and consented to the exercise of jurisdiction by a United States magistrate judge (Doc. 7).

## II. DISCUSSION

A court must affirm the ALJ's decision if it "is supported by substantial evidence in the record as a whole."[10] "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."[11] The court "do[es] not reweigh the evidence or review the factual record de novo."[12] If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision."[13]

Dudrey argues the ALJ erred in evaluating his subjective complaints and the medical opinion of his treating rheumatologist. He also argues that the VE's testimony is inconsistent with the Dictionary of Occupational Titles (DOT) and that the ALJ erred in failing to resolve this inconsistency.

---

[8] *See* **20 C.F.R. §§ 404.981, 416.1481**.

[9] *See* **20 C.F.R. § 422.210(c)**.

[10] *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* **42 U.S.C. § 405(g)**.

[11] *Kirby*, 500 F.3d at 707.

[12] *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994).

[13] *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

5

### A. *Subjective Complaints*

When evaluating the credibility of a claimant's subjective complaints—including pain or nervousness—the ALJ must consider the factors set forth in *Polaski v. Heckler*: "(1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions."[14] "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints."[15] The ALJ may not discredit the claimant's allegations based solely on the absence of objective medical evidence, but the ALJ may rest his credibility finding on "objective medical evidence to the contrary"[16] or "inconsistencies in the record as a whole."[17] Courts must "defer to an ALJ's credibility finding as long as the 'ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so.'"[18]

Dudrey testified that he can only sit for five to ten minutes before needing to briefly stand and stretch. AR 48-49. He said that he can walk two blocks and stand ten minutes before needing to take a five- to ten-minute break to sit. AR 57. The ALJ asked how often he needs to lie down during the day, and Dudrey said he did not need to lie down every day, but he estimated he lies down two to three times a week for an hour at a time. AR 59. He reported flares of pain in his extremities (including his hands and fingers) that made it difficult for him to lift anything; he noted he could pick up a gallon of milk at the grocery store with difficulty, and he occasionally would drop the television

---

[14] ***Black v. Apfel***, 143 F.3d 383, 386 (8th Cir. 1998); *accord* ***Jones v. Callahan***, 122 F.3d 1148, 1151 n.3 (8th Cir. 1997); ***Polaski v. Heckler***, 739 F.2d 1320, 1322 (8th Cir. 1984), *vacated*, 476 U.S. 1167 (1986), *reinstated*, 804 F.2d 456 (8th Cir. 1986).

[15] ***Black***, 143 F.3d at 386.

[16] ***Ramirez v. Barnhart***, 292 F.3d 576, 581 (8th Cir. 2002).

[17] ***Brockman v. Sullivan***, 987 F.2d 1344, 1346 (8th Cir. 1993).

[18] ***Schultz v. Astrue***, 479 F.3d 979, 983 (8th Cir. 2007) (quoting ***Hogan v. Apfel***, 239 F.3d 958, 962 (8th Cir. 2001)).

remote. AR 52-53. He said that when living in Ohio, he suffered severe depression such that he would stay in bed all day at least one day a week; he added his lack of self-care during this time resulted in dental problems (he did not regularly brush his teeth and lost some teeth). AR 55. He testified that since moving to Iowa in June 2016 and receiving regular mental-health treatment, his depression had improved. AR 56-57. He said that he continues to suffer social anxiety and finds it difficult to concentrate and focus. AR 50, 56-57.

The ALJ found the evidence of record did not support greater limitations than her RFC determination. AR 14. The ALJ noted that Dudrey reported improvement in both his physical and (especially) mental symptoms with treatment. AR 15; *see* AR 499, 502, 505, 577, 580, 732-33, 735-36, 809, 994, 1031, 1033, 1035, 1041, 1089, 1234, 1241, 1245, 1248, 1258-59, 1264, 1269, 1277, 1382, 1384 (mental); AR 669, 678, 830, 834, 840, 856, 864, 868, 872, 876 (improvement in physical symptoms while using TENS unit); AR 485-86, 488, 543, 626, 632, 638, 678, 710-11, 722-23, 830, 856, 864, 868, 872, 874, 876, 879, 1301, 1319, 1323 (reporting pain improves with medications). Even though medications helped Dudrey, the ALJ noted the gaps in treatment—for two years upon moving to Ohio and for at least three months upon moving back to Iowa. In addition, as the ALJ noted, at the time of the hearing, Dudrey was taking only ibuprofen for pain—he had discontinued a high dosage of Effexor (venlafaxine) (prescribed to treat both his mental health and fibromyalgia) due to sexual-dysfunction side effects, despite "doing and feeling better" with this medication and increased pain once he stopped it. AR 1269, 1280, 1297-98.

An ALJ may discount a claimant's subjective complaints "if the frequency or extent of the treatment sought . . . is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might

7

improve symptoms."[19] As Dudrey argues, there is evidence that medications initially helped Dudrey's pain but lost effectiveness with time. But that is not the case with Dudrey's use of Effexor. In finding that Dudrey's pain was not as severe as he claimed, the ALJ could consider that ending the sexual side effects of a medication were more important to Dudrey than pain improvement.

The ALJ also noted providers routinely encouraged Dudrey to exercise by walking thirty minutes a day, as weight loss would help his pain and being active would help his depression. *See* AR 16; Doc. 16. Treatment records from Ohio reflect that he acted uninterested when providers counseled him to exercise, even though he admitted on several occasions that exercise improved his pain. AR 671, 710, 722, 733, 810, 836, 843; *see also* AR 731 (reported exercising and trying to lose weight in April 2016). When Dudrey began walking thirty minutes a day in fall 2017 (after he had moved back to Iowa), he reported that walking got easier with time. AR 996, 1000. When he stopped walking due to the weather and blamed pain for his inability to exercise, Dr. Brooks was quick to counsel him that although exercising might be difficult in the beginning, Dudrey needed to exercise, and he should start slowly and work his way up. AR 1062, 1067; *see also* AR 1057. Therapy records from 2018 reflect that Dudrey appeared to be exercising more (AR 1037, 1041, 1234, 1258), supporting the ALJ's determination that Dudrey could be on his feet for longer than he testified, and as Dudrey admitted at the hearing, his mental health benefitted.

Dudrey also suffers from sleep apnea, and providers (including Dr. Brooks) routinely told him that treating this condition with a CPAP machine[20] would help his fatigue, fibromyalgia pain, and depression. AR 1060, 1066-67, 1297-99, 1301; *see* AR

---

[19] **SSR 16-3p**, 81 Fed. Reg. 14166, 14170 (Mar. 16, 2016); *accord* **20 C.F.R. §§ 404.1530(b), 416.930(b)** ("If [a claimant] do[es] not follow the prescribed treatment without a good reason, [the Social Security Administration] will not find [the claimant] disabled . . . .").

[20] Continuous positive airway pressure machine.

983 (referring to specialist for treatment for sleep apnea besides a CPAP machine, noting poor sleep could be causing "all these problems"). In June 2017, Dudrey reported he could not tolerate the CPAP machine, and a provider referred him to a pulmonologist for other treatment options. AR 977, 983; *see also* AR 125 (prior ALJ decision in 2013 noted treatment records showed problems due to poor sleep and lack of compliance with CPAP machine); AR 1070 (Dudrey reported in fall 2017 had not used CPAP machine in years). In November 2017, Dudrey told Dr. Brooks he had difficulty getting to sleep with the CPAP mask on, but in December 2017, he told the pulmonologist that he no longer had any issues with using the CPAP machine. AR 1062, 1358. In early 2018, he reported improved sleep with use of the CPAP, and in June 2018, he told the pulmonologist he was compliant with the device. AR 1031, 1263. In October 2018, he told Dr. Brooks that the CPAP made him feel smothered, and Dr. Brooks encouraged him to continue using it. AR 1301. In February 2019, he had another excuse for Dr. Brooks, stating he was not using the CPAP machine because it caused frequent sinus infections. AR 1297. Dr. Brooks told Dudrey to follow up with the pulmonologist for other treatment options, emphasizing that untreated sleep apnea could be contributing to his problems. *Id*. Again, Dudrey's dislike of wearing a CPAP machine, despite knowing that it would help his fatigue, concentration, and pain, supports the ALJ's determination that he was not as limited as he claimed in these areas.

In addition, as the ALJ noted, although Dudrey consistently reported trouble with memory, attention, and concentration, mental status examinations were mostly normal (including concentration). AR 16-18, 546, 567, 608, 614, 617, 620, 623, 629, 635, 641, 666, 675, 686, 691, 698, 701, 704, 707, 713, 716, 719, 1033, 1037, 1039, 1234, 1245, 1245, 1251, 1253, 1259, 1272; *but see* AR 1029, 1047. The ALJ may consider "multiple

9

mental status examinations . . . reveal[ing] no abnormalities" when determining the weight to assign a claimant's subjective complaints.[21]

The ALJ also considered Dudrey's activities of daily living. AR 20. He drives, handwashes dishes (in ten-minute increments, he said), prepares easy meals like heating up canned soup or a frozen dinner, does laundry, attends to his personal-hygiene needs, and can go to the grocery store. AR 54, 58, 61, 63, 82, 98, 565. Although Dudrey's mother noted he can no longer play guitar because of pain in his fingers, and Dudrey testified that he has difficulty picking up a gallon milk and occasionally drops the television remote, Dudrey also reported being able to use his hands to play games on his phone. AR 52-54, 68. He reported spending most of his day sitting, either using the computer or watching television (the ALJ emphasized the RFC limited Dudrey to sedentary work). AR 50, 54, 63, 97-98. He "rarely" goes to movies. AR 63. In fall 2017, he drove from Iowa to Michigan to visit his girlfriend, who he met online, for five weeks. AR 20, 1216, 1224. From August 2018 through February 2019, he volunteered at a homeless shelter, working the overnight shift on at least one occasion. AR 1248, 1261, 1271, 1276. Substantial evidence supports the ALJ's determination that Dudrey's activities of daily living were inconsistent with his complaints of extreme limitations.[22]

The ALJ also noted statements by Dudrey in therapy calling into question his motivations for failing to obtain employment. AR 18. In December 2017, Dudrey complained that less limited people than him received disability, but after discussion with his therapist, he noted he was contemplating working rather than continuing to seek disability. AR 1226; *see also* AR 1228. In August 2018, he complained that if he obtained a job, he would not be able to visit his girlfriend, and his therapist instructed

---

[21] ***Halverson v. Astrue***, 600 F.3d 922, 930 (8th Cir. 2010).

[22] *See **Pearsall v. Massanari***, 274 F.3d 1211, 1218 (8th Cir. 2001) (ALJ may consider activities of daily living).

10

him to consider instead that if he were employed, he would be able to afford to visit his girlfriend. AR 1255.

Overall, substantial evidence supports the ALJ's determination that Dudrey was less limited than alleged. Dudrey points to treatment records showing that he routinely complained of pain and fatigue and that providers observed tenderness on objective examination (consistent with fibromyalgia). No one disputes that Dudrey suffers real pain and limitations from fibromyalgia. But just because he suffers from fibromyalgia does not mean he is as limited as he alleged. The ALJ gave good reasons, supported by substantial evidence, for failing to fully credit Dudrey's testimony. Although there is support in the record for an opposite conclusion (as noted by Dudrey), it is not for this court to reweigh the evidence.

### B. Medical-Opinion Evidence

When determining a claimant's RFC, the ALJ considers medical opinions "together with the rest of the relevant evidence."[23] "The ALJ must give 'controlling weight' to a treating [source's] opinion if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'"[24] "Whether the ALJ gives the opinion of a treating [source] great or little weight, the ALJ must give good reasons for doing so."[25] The ALJ considers the following factors to determine the weight to assign any opinion assessing a claimant's RFC:

> (1) whether the source has examined the claimant; (2) the length, nature, and extent of the treatment relationship and the frequency of examination; (3) the extent to which the relevant evidence, "particularly medical signs

---

[23] **20 C.F.R. §§ 404.1527(b), 416.927(b)**.

[24] *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (quoting *Wagner v. Astrue*, 499 F.3d 842, 848-49 (8th Cir. 2007)); *see also* **20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)**.

[25] *Reece v. Colvin*, 834 F.3d 904, 909 (8th Cir. 2016).

11

and laboratory findings," supports the opinion; (4) the extent to which the opinion is consistent with the record as a whole; (5) whether the opinion is related to the source's area of specialty; and (6) other factors "which tend to support or contradict the opinion."[26]

Dudrey argues that the ALJ did not give good reasons for discounting the opinion of Michael Brooks, MD, his treating rheumatologist. Dudrey reestablished treatment with Dr. Brooks in November 2017, after previously seeing him ten to fifteen years ago for fibromyalgia and osteoarthritis. AR 1062. He had follow-up appointments in February, June, and October 2018 and February 2019. Doc. 16. On April 25, 2019, Dr. Brooks completed a form entitled "fibromyalgia medical source statement" opining as to Dudrey's RFC limitations. AR 1371-74. He opined that Dudrey suffered the following limitations related to sitting, walking, and standing:

- Can only walk three city blocks without rest or severe pain;
- Can sit for one hour at a time before needing to get up, for a total of two hours in an eight-hour day;
- Can stand for thirty minutes at a time before needing to sit down or walk around;
- Can stand/walk for a total of two hours in an eight-hour workday;
- Needs to be able to shift positions at will between standing, walking, and sitting; and
- Needs to walk for five minutes every hour.

AR 1372-73. He opined that Dudrey could occasionally lift ten pounds and frequently lift less than ten pounds (consistent with the ALJ's RFC determination). AR 1373. He found Dudrey could only rarely twist and stoop and could never crouch or squat. *Id*. He found Dudrey suffered limitations in reaching, grasping objects, and fine manipulations, and could use his hands, fingers, and arms less than 20% of an eight-hour workday. AR 1374. He opined that Dudrey would need a ten- to fifteen-minute unscheduled break once a week, that he would be off task 20% of the workday, and that he would miss work twice a month. AR 1373-74.

---

[26] ***Owen v. Astrue***, 551 F.3d 792, 800 (8th Cir. 2008) (quoting the current **20 C.F.R. §§ 404.1527(c), 416.927(c)**).

12

The ALJ assigned Dr. Brooks's opinion little weight, finding it inconsistent with the record as a whole. AR 19-20. Substantial evidence, discussed in the preceding section, supports this determination (including objective examinations largely reflecting normal concentration and Dr. Brooks's own treatment notes recognizing Dudrey could walk for thirty minutes at a time).

In addition, as the Commissioner notes, Dr. Brooks's treatment records do not reflect that Dudrey complained of hand and finger pain (even though Dr. Brooks found his ability to grip and handle extremely limited). At his initial appointment with Dr. Brooks, Dudrey did state that he had some difficulty lifting a full glass to his mouth, but he also stated he could turn taps on and off without difficulty. AR 1065-66. Dudrey reported pain radiating to his arms and hands intermittently to an Ohio provider during summer 2016, and he reported hand tics caused by anxiety in June 2018. AR 843, 858, 870, 874, 879, 1243. But otherwise, the treatment records do not reflect that Dudrey complained of issues with his hands and fingers, and his activities of daily living are inconsistent with Dr. Brooks's opinion that he could only use his hands and fingers 20% of the time. *See also* AR 493, 528, 544, 612, 627, 633, 639, 726 (normal grip strength).

Dudrey also faults the ALJ for failing to individually discuss and reject each of Dr. Brooks's opined limitations. The ALJ need not "mechanically list and reject every possible limitation."[27] Substantial evidence supports the ALJ's decision to afford Dr. Brooks's opinion little weight.

### C. Conflict with the DOT

Once the ALJ determines that the claimant cannot perform his past work, the ALJ evaluates at step five whether the claimant can perform other work that "exist[s] in significant numbers in the national economy (either in the region where [the claimant]

---

[27] *McCoy v. Astrue*, 648 F.3d 605, 615 (8th. Cir. 2011).

13

lives or in several regions in the country)."[28] The Commissioner bears the burden of proving that jobs exist in significant numbers that someone with the claimant's age, education, work experience, and RFC can perform.[29] The Commissioner may meet this burden through testimony by a VE, but "VE testimony that conflicts with the DOT 'does not constitute substantial evidence upon which the Commissioner may rely to meet the burden'" if the inconsistency is unexplained by the VE.[30]

> Under Social Security Ruling (SSR) 00-4p, the ALJ must "ask about any possible conflict" between VE evidence and "information provided in the DOT." . . . If there is an "apparent unresolved conflict" between VE testimony and the DOT, the ALJ must "elicit a reasonable explanation for the conflict" and "resolve the conflict by determining if the explanation given [by the expert] provides a basis for relying on the [VE] testimony rather than on the DOT information."[31]

In this case, in determining Dudrey's cognitive limitations, the ALJ found Dudrey is able to:

- Understand, remember, and carry out **simple** instructions;
- Use judgment in making **simple** work-related decisions; and
- Deal with changes in a **routine** work setting.

AR 14, 72-73 (emphasis added). At the hearing, the VE testified that a hypothetical individual with Dudrey's limitations and background could work as a document preparer, DOT 249.587-018; addresser, DOT 209.597-010; and ticket counter, DOT 219.587-010; and these are the jobs the ALJ found Dudrey could perform at step five. *Id.*; AR 22. According to the DOT, the document preparer and ticket counter positions require a

---

[28] **20 C.F.R. §§ 404.1560(c)(1), 416.960(c)(1)**.

[29] *See Gieseke v. Colvin*, 770 F.3d 1186, 1189 (8th Cir. 2014); **20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2)**.

[30] ***Moore v. Colvin***, 769 F.3d 987, 990 (8th Cir. 2014) (quoting ***Kemp v. Colvin***, 743 F.3d 630, 633 (8th Cir. 2014)).

[31] *Id.* at 989-90 (alterations in original) (quoting **SSR 00-4p**, 65 Fed. Reg. 75759, 75760 (Dec. 4, 2000)).

14

reasoning level of 3, which Dudrey argues conflicts with his RFC limitation to simple and routine work. The Commissioner disagrees that an "apparent conflict" exists.

I have previously addressed similar arguments and noted that circuit courts and district courts (within and without the Eighth Circuit) are split.[32] I have concluded that there is Eighth Circuit precedent supporting both sides and that the Eighth Circuit has not definitively weighed in on the issue.[33] At bottom, I have noted that "whether an inconsistency exists depends on the facts of each case"[34] (while still recognizing that the caselaw cannot be reconciled).[35]

---

[32] ***Dighton v. Saul***, No. 18-cv-57-LTS-KEM, Doc. 17 (N.D. Iowa Sept. 4, 2019), *report and recommendation adopted*, 2019 WL 4731943 (Sept. 27, 2019); ***Hall v. Comm'r of Soc. Sec.***, No. 18-CV-2032-LTS-KEM, 2019 WL 7666529, at *10-13 (N.D. Iowa Aug. 16, 2019), *report and recommendation adopted*, 2019 WL 5085427 (Oct. 10, 2019); *see also* ***Velez v. Saul***, No. 18-CV-2055-LTS-KEM, 2020 WL 3120989, at *8 (N.D. Iowa Feb. 12, 2020), *report and recommendation adopted,* 2020 WL 1131487 (Mar. 9, 2020), *vacated and remanded,* No. 20-1945 (8th Cir. May 28, 2021).

[33] *See* ***Hall***, 2019 WL 7666529, at *10-13 (summarizing relevant Eighth Circuit cases—including *Clay*, which noted a limitation to simple concrete instructions is arguably inconsistent with level three reasoning; *Hillier*, which noted tension in the abstract between an RFC limitation to understanding, remembering, and following simple concrete instructions and level 3 reasoning; *Renfrow*, which held an inability to do complex technical work did not conflict with level 3 reasoning; and *Welsh*, which stated that a limitation to simple, routine, repetitive work does not conflict with level 3 reasoning (but is otherwise distinguishable)).

[34] *See* ***Dighton***, 2019 WL 4731943, at *5 (summarizing report and recommendation).

[35] For example, courts in this district have held no apparent conflict exists between level 3 reasoning and:
- Simple, routine, and repetitive tasks. ***Murphy v. Berryhill***, No. 18-CV-61-LRR, 2019 WL 2372896, at *6 (Apr. 10, 2019).
- Understanding, remembering, and carrying out simple instructions; using judgment in making simple work-related decisions; and dealing with changes in a routine work setting. ***Galloway v. Kijakazi***, No. 20-CV-00059-CJW, 2021 WL 5278545, at *3, *29 (N.D. Iowa Sept. 2, 2021) (primarily addressing conflict with reasoning level 2 jobs), *report and recommendation adopted,* 2021 WL 4399719 (Sept. 27, 2021), *appeal filed*, No. 21-3691 (8th Cir. Nov. 22, 2021).
- Simple, routine tasks; and simple work-related decisions. ***Hinds v. Saul***, No. 18-CV-3065-CJW, 2020 WL 3120349, at *18 (N.D. Iowa Feb. 3, 2020) (claimant primarily argued for inconsistency based on limitation that ALJ did not include), *report and*

Since I last considered the issue, the Eleventh Circuit has held that "there is an apparent conflict . . . between a limitation to simple, routine, and repetitive tasks and the demands of level 3 reasoning."[36] And the Fourth Circuit has held (in an unpublished opinion) that "an apparent conflict exists between a limitation to short and simple instructions and Reasoning Development Level 3 occupations."[37] They join the Tenth Circuit, which has held a limitation to simple and routine work tasks conflicts with level 3 reasoning;[38] and the Ninth Circuit, which has held level 3 reasoning conflicts with "a limitation to simple, repetitive tasks,"[39] and a limitation to "understanding and remembering simple instructions and [being] capable of carrying out routine tasks in a reliable manner."[40] The Seventh Circuit is on the opposite side of the dispute (potentially)

---

*recommendation adopted,* No. 18-CV-3065-CJW-MAR, 2020 WL 1043448 (N.D. Iowa Mar. 4, 2020), *vacated and remanded,* No. 20-1918 (8th Cir. May 24, 2021).

Courts in this district have also held that remand was required to resolve the conflict between level 3 reasoning and:
- Simple, routine tasks. **Heins v. Saul**, No. 19-CV-2043-LTS, 2020 WL 6052583, at *9-10 (N.D. Iowa June 11, 2020), *report and recommendation adopted,* 2020 WL 4369450 (July 30, 2020).
- Simple, routine tasks with simple instructions. **Jennings v. Berryhill**, 3:17-cv-03062-LTS, 2018 WL 4107911 at *3-4 (N.D. Iowa Aug. 29, 2018) (adopting report and recommendation on clear error review).
- Simple, routine, repetitive tasks; simple work-related instructions and decisions; no fast-paced production requirements; and occasional judgment and workplace changes. **Dighton**, 2019 WL 4731943, at *4-6.
- Understanding, remembering, and carrying out short, simple instructions; responding appropriately to work pressures in a usual work setting; and responding to changes in a routine work setting. **Ferrin v. Saul**, No. 19-CV-4010-LRR, 2020 WL 1979754, at *11, 14-15 (N.D. Iowa Apr. 8, 2020*), report and recommendation adopted*, 2020 WL 1976297.

[36] **Viverette v. Comm'r of Soc. Sec.**, 13 F.4th 1309, 1316 (11th Cir. 2021).

[37] **Keller v. Berryhill**, 754 F. App'x 193, 198 (4th Cir. 2018).

[38] **Hackett v. Barnhart**, 395 F.3d 1168, 1176 (10th Cir. 2005).

[39] **Zavalin v. Colvin**, 778 F.3d 842, 846-47 (9th Cir. 2015).

[40] **Buck v. Berryhill**, 869 F.3d 1040, 1049, 1051 (9th Cir. 2017) (Commissioner conceded error).

16

with its holding that a level 3 reasoning does not conflict with a limitation to "simple, unskilled work."[41]

The Social Security Administration updated its guidance for VEs in June 2020, providing that "[t]here is an apparent conflict between a job that requires reasoning level 3, and a hypothetical individual that can perform only 'simple' or 'repetitive' tasks."[42] Accordingly, the Social Security Administration instructed that VEs should "[b]e prepared to explain how the hypothetical individual could perform" level 3 reasoning jobs.[43]

Ultimately, I conclude that an apparent conflict exists between reasoning level 3 and Dudrey's RFC to understand, remember, and carry out simple instructions; use judgment in making simple work-related decisions; and deal with changes in a routine work setting. By definition, reasoning level 1 work requires carrying out "simple one- or two-step instructions;" and reasoning level 2 work requires carrying out "detailed but uninvolved instructions"[44] (which courts have interpreted as meaning lengthier but noncomplex).[45] Reasoning level 3 work, by contrast, just refers to carrying out "instructions."[46] Thus, reasoning level 3 "lifts the restriction on how complex the instructions can be—allowing for any 'instructions.'"[47] Here, there was enough of a

---

[41] *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009).

[42] **Social Security Administration, Office of Hearing Operations, Office of the Chief ALJ, Vocational Expert Handbook** 39 (June 2020), available at:

https://www.ssa.gov/appeals/public_experts/Vocational_Experts_(VE)_Handbook-508.pdf.

[43] *Id.*

[44] *DOT, App. C*.

[45] *Buckwalter v. Acting Comm'r of Soc. Sec.*, 5 F.4th 1315, 1323 (11th Cir. 2021); *see also Moore v. Astrue*, 623 F.3d 599, 604 (8th Cir. 2010).

[46] **DOT, App. C**.

[47] *Buckwalter*, 5 F.4th at 1323.

17

conflict that the VE should have acknowledged the issue and explained why Dudrey's RFC allowed him to perform level 3 reasoning jobs.

The Commissioner suggests that by limiting Dudrey to simple and routine work, the ALJ meant simply to limit Dudrey to unskilled work, described as work that "needs little or no judgment to do simple duties that can be learned on the job in a short period of time."[48] Unskilled work refers to work with a specific vocational preparation (SVP) level of 1 or 2.[49] SVP levels are defined in the DOT by reference to the amount of training needed to perform the job (whether through schooling, on the job, past experience, or otherwise).[50] As Chief Judge Strand has noted:

> SVP levels and reasoning levels are generally correlated: jobs that require longer training generally have high reasoning levels and jobs that require limited training usually have low reasoning levels. However, the correlation runs stronger in one direction: jobs that require very little training almost never require reasoning levels above two, whereas jobs that require longer training have greater variance in reasoning level and frequently do not require a high reasoning level. For example, the DOT contains only two SVP Level Two jobs, and no SVP Level One jobs, that require a reasoning level higher than three. In contrast, there are several jobs that have an SVP level of five or six but range in reasoning level from two to five. Overall, the vast majority of SVP level two jobs, and almost all SVP level one jobs, have a reasoning level of two or less.[51]

Limitations related to lower SVP-level jobs and lower reasoning-level jobs almost always overlap. Here, I do not find that by saying Dudrey was limited to understanding, remembering, and carrying out simple instructions; using judgment in making simple work-related decisions, and dealing with changes in a routine work setting, the ALJ meant to capture only that Dudrey can perform unskilled

---

[48] *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010) (quoting **20 C.F.R. § 416.968(a)**).

[49] *Id.* at 924.

[50] **DOT, App. C**.

[51] *Hall*, 2019 WL 5085427, at *15.

work. If so, the ALJ should have just said. As one court has noted, when the ALJ phrases the RFC by using "imprecise non-DOT language," the ALJ "runs the risk of remand for clarification."[52]

Remand cannot be avoided by examining the mental requirements of Dudrey's past work. Dudrey has suffered "mental deterioration" since he last worked, and the ALJ found he could not return to his past work.[53] And the Commissioner does not argue harmless-error principles apply. In any event, I would be hesitant to find that 8,000 jobs in the national economy (the remaining reasoning level 2 jobs) constitutes a significant number on harmless-error review.

I find that remand is required for the ALJ to resolve the apparent unresolved conflict between Dudrey's mental limitations and the ability to perform reasoning level 3 jobs.

> On remand, the ALJ may well conclude that Claimant can perform jobs requiring level 3 reasoning. Case law shows that claimants are often found capable of doing so. However, claimants are only found capable of doing so after courts are satisfied that the ALJs have obtained testimony that resolves any apparent conflicts.[54]

### III. CONCLUSION

I **reverse** the Commissioner's decision and **remand** this case to the Social Security Administration for further proceedings. Judgment shall enter in favor of Dudrey.

**SO ORDERED** March 30, 2022.

_Kelly K.E. Mahoney_
Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa

---

[52] *Gilbert v. Berryhill*, No. 3:18CV00198 PSH, 2019 WL 3416869, at *4 (E.D. Ark. July 29, 2019).

[53] *Cf. **Hillier v. Soc. Sec. Admin.**, 486 F.3d 359, 366-67 (8th Cir. 2007).

[54] *Heins*, 2020 WL 6052583, at *10.